# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.        1:23-CV-01349-SP

RICHARD GRIGSBY,
CHERYL GRIGSBY, AND
ROCKY MOUNTAIN MEMORIES, INC.

       Plaintiffs,

v.

ESTES PARK, COLORADO, A COLORADO MUNICIPAL CORPORATION

       Defendant.

---

## PARTIAL MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(B)(6)

Defendant, Estes Park, Colorado (the "Town"), by and through its attorneys at Nathan Dumm & Mayer P. C., hereby submits its Partial Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) with supporting authority as follows:

### INTRODUCTION AND SUMMARY OF ARGUMENT

Like most mountain communities, the Town suffers from a shortage of affordable housing. That problem is exacerbated by homeowners who elect to utilize a home or condo for short-term rentals, which removes that property from the available supply of properties that can be rented to long-term residents. This strangle on supply affects lower-income workers the most, largely in the hospitality and tourism sectors of the Town's economy.

Because short-term rental operations benefit directly from the Town's tourism economy, but also hurt the housing market, the Town enacted an annual linkage fee on each short-term rental property. The purpose of the fee is to defray the costs of mitigating the impact caused by

short-term rental properties, mainly by providing funds to rehabilitate the Town's affordable housing market.

Plaintiffs have operated three short-term rentals and, as evidenced by their Complaint, do not want to pay the Town's fee (which averages out to only 2.6% of gross revenue for a typical short-term rental in the Town). But instead of seeking a legislative solution, Plaintiffs launch six constitutional attacks on the linkage fee. As set forth below, Plaintiffs make several detrimental errors in pleading their constitutional claims, like ignoring the deferential standard provided under rational basis review and failing to engage in any proper takings analysis recognized under the Fifth Amendment.

The Town thus seeks dismissal of Plaintiffs' federal claims.[1]

## RELEVANT FACTUAL ALLEGATIONS

1.      Plaintiffs own and have operated three rental cabins within Town limits. [ECF 1, ¶ 25].

2.      Short-term rentals are a heavily regulated industry in the Town, requiring property owners to obtain a license, comply with building/zoning regulations, and operate the rentals in a manner that does not disturb the surrounding community. [*Id*.].

---

[1] To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

3.      The Town's Code specifically notes that a business license to operate a short-term rental "does not convey a right to continue operation as a vacation home or bed and breakfast inn in future years." [Ex. A, p. 8, § 5.20.110(d)(3)].[2]

4.      In March 2022, the Town passed an ordinance designating a linkage fee on short-term rental properties rented for stays less than thirty days that helps defray the costs imposed on the Town's housing market by short-term rentals. [ECF 1, ¶ 4].

5.      The fee was based on a study the Town had conducted, which quantified the economic impact short-term rentals have on the Town's housing market. [*Id.*, ¶ 17]

6.      The fee was not due immediately, but rather was deferred until the start of the 2023 rental year. [*See id.*, ¶¶ 26-27 (denoting payment for 2023 license year)].

7.      In January 2023, Plaintiffs paid the 2023 license fees for Cabin #1 and Cabin #2 (which includes the linkage fee), doing so "under protest." [*Id.*, ¶ 27].

8.      Plaintiffs attempted to pay part of the 2023 license fee for Cabin #3, but intentionally refused to pay the linkage fee component. [*Id.*].

9.      Under Title 5 of the Town's Code, when a short-term rental license has not been properly renewed, as was the case for Cabin #3, "the license shall be considered automatically to have expired and terminated without any further action necessary by the Town." [Ex. A, p. 8, § 5.2.110(d)(3)].

---

[2] The Court may take judicial notice of municipal ordinances and regulations without running afoul of Rule 12(b)(6)'s requirement to consider allegations within the four corners of a complaint. *See North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1221 n.3 (10th Cir. 2021).

10.     Thus, by operation of the Code, and without any further action by the Town, after Plaintiffs intentionally refused to pay the full licensing fee, Cabin #3 no longer has a valid license. [*Id*.].

## LEGAL ARGUMENT

As a threshold matter, for many of their constitutional claims the Plaintiffs cited to both the U.S. Constitution and the Colorado Constitution. Yet Plaintiffs do not allege that the Colorado Constitution affords them any greater rights or privileges than does the U.S. Constitution, at least in the context of this case. The Town is also not aware of any material distinction in protections for the claims raised in the Complaint. Thus, the Town will focus on federal precedent in this Motion, but seeks dismissal of *all* constitutional claims pled in Plaintiffs' third through eighth claims for relief.

i.     *Distinguishing between long and short-term rentals does not violate equal protection. (Third Claim for Relief)*

It is axiomatic that all legislation engages in some form of inherent line drawing, whether it be with respect to the age to drive (exactly 5,840 days), or the type of injury that determines compensation (like Colorado's scheme for worker's compensation injuries). Plaintiffs ignore this well-established constitutional principle when arguing that a fee assessed on short-term rentals violates their right to equal protection because rentals thirty days or longer are not assessed the same fee. [ECF 1, ¶ 76].

Neither the U.S. Supreme Court nor the Colorado Supreme Court has ever required "mathematical nicety" for a statute to pass rational basis review;[3] rather, "equal protection will tolerate a rough accommodation of variant interests." *Duran v. ICAO*, 883 P.2d 477, 483 (Colo. 1994) (internal citations and quotations omitted). Under rational basis, the proper inquiry is not whether the law is perfect in its classifications (as nearly every law would be invalidated under that standard), but rather whether the classifications have some reasonable basis that further a government interest. *Dandridge v. Williams*, 397 U.S. 471, 485 (Colo. 1970). Furthermore, rational basis review requires federal courts to seek out and "consider every plausible legitimate state interest that might support" the challenged legislation. *Powers v. Harris*, 379 F.3d 1208, 1218 (10th Cir. 2004).

As a threshold matter, Plaintiffs fail to demonstrate that they are similarly situated to other homeowners who rent their homes on a long-term basis, *i.e.*, longer than 30 days. They claim in overly simplistic terms that because all properties are "used identically as single-family residences," they are similarly situated to all other homeowners who lease property. [ECF 1, ¶ 74]. But this argument ignores a fundamental aspect of tourism: most people vacation in one spot for fewer than thirty days. Equally noncontroversial, most individuals who wish to live and work in a particular municipality will seek out a lease longer than thirty days. Thus, the *duration* of a stay dictates largely whether a particular property will attract tourists or long-term residents. Because this is the exact problem Title 5's linkage fee seeks to address, *i.e.*, a lack of properties available to long-term residents, Plaintiffs cannot claim they are similarly situated to other

---

[3] Plaintiffs appear to concede that a rational basis standard applies to their challenge. [*See* ECF 1, ¶ 79 (applying rational basis)]. Even if not conceded, renting a home for profit on a short-term basis is not a fundamental right; thus, rational basis applies. *See, e.g., Yim v. City of Seattle*, 63 F.4th 783, 791 (9th Cir. 2023) (renting property is not a fundamental right).

property owners merely because they are all "residential." *See Murphy v. Walworth Cnty.*, 383 F. Supp. 3d 843, 851 (E.D. Wis. 2019) ("the single-family homes used for short-term rentals are not similarly situated as single-family homes used for long-term use.").

But even if Plaintiffs could show their tourism-based properties were similarly situated to more traditional rental properties, the Town's fee would still easily pass rational basis review. The Town, like many other resort communities, suffers from an acute shortage of affordable housing that is exacerbated by homeowners who, instead of renting long-term to residents in the community, choose the more lucrative path of renting short-term to tourists. This economic boon for homeowners has the obvious effect of reducing supply in the housing market, worsening the Town's legitimate interest in promoting stable housing for Town residents of all incomes. Furthermore, because short-term rental operators benefit directly from the Town's tourism-based economy (including such businesses as restaurants, coffee shops, and local transportation), the fee is a reasonable measure to defray the direct costs short-term rental homes have on the housing available for the Town residents they depend on to attract tourists. [*See* Ex. A, pp. 14-15, § 5.20.120(a)(1-5)].

The thirty-day demarcation for who must pay the fee furthers and accommodates these goals, as most tourists will vacation for fewer than thirty days and most long-term residents tend to seek stable housing at greater intervals than a month. Thus, the fee is intended and should fall, for the most part, on those homeowners who derive a profit from the lucrative short-term rental market. Undoubtedly there will be examples of homeowners who rent to tourists for longer than thirty days, perhaps allowing those property owners to escape the fee. But the Equal Protection Clause does not demand perfection, and the mere fact that legislation "may result in some

inequities in individual cases" does not give cause to invalidate a law under rational basis review. *Duran*, 883 P.2d at 487.

Because of the proliferation of short-term rentals in recent years, other municipalities have passed similar legislation that addresses the deleterious effects on the community caused by short-term vacation rentals – legislation that courts have held satisfy rational basis review. For example, Forsyth County, Georgia, passed legislation prohibiting short-term rentals in certain zone districts of the county, with a short-term rental being defined as any property rented for a period of less than thirty days. *Short Term Rental Owners Assoc. of Georgia, Inc. v. Cooper*, 515 F. Supp. 3d 1331, 1337 (N.D. Ga. 2021). Relying on a number of similar holdings, the court struck down an equal protection challenge as the ordinance was "a rational and reasonable means to accomplish enhancing the residential character of the community by cutting down on traffic and protecting surrounding property values." *Id*. at 1347. A similar result played out in the City of New Buffalo, where a federal court rejected the very same "thirty versus thirty-one day" argument Plaintiffs advance here, holding that short-term rentals "operate more akin to commercial lodging and cater to transient populations, vacationers, bachelor/bachelorette parties, and others that have no stake in the community. In contrast, long-term rentals...connote a permanency of residence akin to a homesteaded residence." *Moskovic v. City of New Buffalo*, Case No. 1:21-cv-144, 2022 WL 16548948, at *19 (W.D. Mich. Oct. 31, 2022). A similar conclusion was reached in *Murphy v. Walworth County*, where the court rejected an equal protection challenge because "single-family homes used for short-term rentals are not similarly situated as single-family homes used for long-term use." 383 F. Supp. at 851.

Because Plaintiffs ignore long standing and uncontroversial principles of equal protection, they fail to state a constitutional violation based on the Town's distinction between short and long-term rentals and their associated effects on the community and the Town's housing supply.  Dismissal of Plaintiffs' third claim for relief is, therefore, appropriate.

ii.      *No takings has occurred. (Fourth Claim for Relief)*

Plaintiffs' fourth claim for relief alleges a deeply flawed takings theory, in which Plaintiffs protest with emphasis that they wish to use and rent their homes but "are prohibited from doing so" in violation of their property rights under the Fifth Amendment. [ECF 1, ¶ 99]. Of course, Title 5 did not prevent the Plaintiffs from doing anything with their property – they continued to enjoy all of the property rights they previously held. They simply had to pay a fee for the effect their business has on the community. That is not a takings under any federal or state precedent.

Because Plaintiffs do not allege a physical takings of their properties, they are relegated to one of two forms of regulatory takings: (1) a regulatory action that deprives the owner of all economically beneficial use of their property, or (2) a regulatory action that goes "too far," considering the factors set forth in *Penn Central Transp. Co. v. City of New York*¸438 U.S. 104 (1978). Plaintiffs don't specify which form of regulatory takings they wish to advance, but under either theory, Plaintiffs lack of a viable claim.

Plaintiffs cannot sustain a total regulatory taking because Title 5 does not prohibit their ability to sell their property, rent the property long term, or occupy the property themselves. Indeed, Title 5 didn't even prevent Plaintiffs from using the property for short-term rentals – they just simply had to pay the requisite fees. Certainly Title 5 does not prohibit "all economically

beneficial use," as is necessary to show a total regulatory taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

Plaintiffs' takings claim fares no better under the Penn Central factors, which generally require courts to consider: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

While Plaintiffs have many gripes about Title 5 in their Complaint, an outsized economic impact is not one of them. In fact, they never discuss the economic impact of the regulation, other than to note that in comparison to other short-term rentals, Cabin #3 is much smaller and generates less revenue than other rentals. [ECF 1, ¶ 19]. Plaintiffs do not allege that the impact fee is so onerous as to have an effect on the value of their property (nor could they, as the fee is less than six percent of overall revenue for their smallest cabin).[4] At best, they insinuate an undefined effect on their profits. But the first Penn Central factor typically *requires* an effect on the value of property, as "profitability" is almost always a speculative concept. The U.S. Supreme Court said it best: "loss of future profits – unaccompanied by any physical property restriction – provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform." *Andrus v. Allard*, 444 U.S. 51, 66 (1979). The Court in this case need not go as far as *Andrus*, as Plaintiffs failed to incorporate any allegations about the economic impact of Title 5 in their Complaint. But even if they had, such allegations would not establish a takings.

---

[4] *See* ECF 1, ¶ 19 (annual revenue of 23,222, with a fee of $1,390, which equates to 5.9 percent of overall revenue). Further undercutting Plaintiff's argument is the fact that Title 5 allows short-term rental operators to pass the fee along to tourists, potentially eliminating any financial impact to landowners.

Plaintiffs place more effort into the second factor of Penn Central, reasonable investment-backed expectations, by alleging they were "induced by Town policies to pursue a short-term vacation rental by owner business model." [ECF 1, ¶ 25]. Yet this argument breaks down immediately upon examination of the basis for their expectations. They claim that they received an annual license to operate short-term rentals, which required substantial investment in the form of land use approvals and building permits. [*Id*.]. But their expectations stop there. Plaintiffs provide no rationale explaining why they expected to be free from *future* regulations governing their short-term rentals. The mere fact that the Town has allowed short-term rentals to operate in the past – albeit, subject to regulation – does not mean homeowners can reasonably cultivate an expectation that the status quo will go on forever. Indeed, the Court in *Penn Central* stated exactly that: "the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." 438 U.S. at 130. In other words, Plaintiffs fail to show that the Town ever affirmatively promised short-term rentals would be free from future regulations – and the mere fact that they were allowed to operate for a number of years without a linkage fee does not rise to the level of an expectation necessary to trigger the Takings Clause. This is further reinforced by the Town's Code, which specifically advises property owners that the ability to operate a short-term rental in one year "does not convey a right to continue operation as a vacation home or bed and breakfast inn in future years." [Ex. A, p. 8, § 5.20.110(d)(3)].

In terms of the last Penn Central factor, the character of the government action, the U.S. Supreme Court has long recognized the authority of local governments to "regulate housing

conditions…without paying compensation for all economic injuries that such regulation entails." *Yee v. City of Escondido, Cal.*, 503 U.S 519, 528-29 (1992) (internal citations omitted). Plaintiffs do not appear to dispute the urgent need for the Town to address affordable housing, referencing in their Complaint the Town's determination that "[t]he workhouse need in the town of Estes Park is estimated to be in the hundreds of millions of dollars and affects almost all sectors of the economy." [ECF 1, p. 5]. While Plaintiffs alternatively claim that Title 5's solution is not enough or is directed at the wrong sectors of the tourism market, neither excuse invalidates the Town's decision to address the shrinking supply of affordable housing. Thus, this factor similarly weighs against a takings.

Much like equal protection, other short-term renters nationwide have challenged land use restriction under takings theories, with federal courts similarly rejecting challenges under both total and regulatory analyses. The best example is *Nekrilov v. City of Jersey City*, where despite previously courting short-term rentals, a municipality reversed course and adopted a series of regulations that limited the ability of existing property owners to rent on a short-term basis. 45 F.4th 662, 666-68 (3rd Cir. 2022). In a thorough and well-reasoned order, the United States Court of Appeals for the Third Circuit upheld the district court's order finding that no takings had occurred, partially because the regulations furthered the goals of "protecting the residential housing market in Jersey City and promoting public safety by reducing the nuisance behavior associated with short-term rentals." *Id*. at 678. The same analysis applies with equal effect here.

Accordingly, Plaintiffs' fourth claim for relief should thus be dismissed as they fail to set forth any allegations demonstrating a recognized form of takings.

iii. *Plaintiffs' alternative takings theories also lack any merit. (Fifth and Sixth Claims for Relief).*

In their fifth and sixth claims for relief, Plaintiffs allege some derivative form of a takings, although it is not entirely clear how such claims would differ from their fourth claim for relief.

As best can be gleaned from the Complaint, in both claims Plaintiffs allege that they paid a certain portion of the Town's overall licensing fee for all three of their cabins, but then admit they only paid the linkage fee portion for Cabin #1 and Cabin #2 – intentionally forgoing payment on Cabin #3. [ECF 1, ¶¶ 115, 139]. Plaintiffs then allege in conclusory fashion that the Town "punitively revoked" the license for Cabin #3 based on nonpayment of the linkage fee. [*Id.*, ¶¶ 116, 140].[5] Plaintiffs then complain that they were unable to cure their intentional decision to forgo payment on Cabin #3, either through late payment or a hearing, resulting in the loss of a business license for that specific vacation home. [*Id.*, ¶¶ 117-18, 141-42]. They claim the resulting loss of a license prohibits them from using the property in violation of the Fifth Amendment. [*Id.*, ¶¶ 122, 152].

From both a factual and legal perspective, these allegations cannot sustain a takings claim.

From a factual perspective, Title 5 very clearly states that if a vacation home business license has not been properly renewed, "the license shall be considered automatically to have expired and terminated without any further action necessary by the Town." [Ex. A, p. 8, §

---

[5] There was no revocation and it certainly wasn't punitive. The Plaintiffs lost their license to Cabin #3 by automatic application of Title 5.  Their license simply expired, on its own terms.  [*See* ECF 1, ¶ 27 ("Plaintiffs paid the Vacation Home License fee for Cabin #3 ($250) but did not pay the Impact Fee $1,390 and requested a fair hearing and due process.")].

5.20.110(d)(3)]. Plaintiffs were on notice of this provision and knew about it, as they had already decided to pay Title 5's fees for the other two cabins "under protest." [ECF 1, ¶ 27]. To the extent Plaintiffs are attempting to claim the Town interfered with their investment-backed expectations regarding Cabin #3, their position is patently unreasonable as they knew the failure to pay the fee under the Code would result in expiration of their business license with no further action by the Town. Just like any other business under a regulatory scheme, Plaintiffs' failure to comply with the Town's code can and did result in a loss of privilege to continue operating a short-term rental business. Indeed, Title 5 provides that *exact warning*: "A business license does not convey a right to continue operation as a vacation home or bed and breakfast inn in future years." [Ex. A, p. 8, § 5.20.110(d)(3)]. While Plaintiffs may ultimately regret their decision to consciously forgo payment of the licensing fee, that decision does not provide any factual basis for a valid takings claim.

From a legal perspective, Plaintiffs fail to explain how the loss of a business license for Cabin #3 results in any form of a compensable takings. As a threshold matter, the Town challenges whether Plaintiffs have even established a protected property interest necessary to maintain a takings claim under these circumstances. The property right they are asserting is an alleged entitlement to renewal of their business license for future years, namely 2023 and beyond. Yet as already noted, Title 5 very clearly states that a current business license does not convey a right to operate a vacation home in future years and a license automatically lapses upon failure to properly renew it. A protected property interest arises only where a party has a legitimate entitlement to a government issued benefit, as opposed to a unilateral expectation of it based on an incorrect assumption or flawed reasoning. *Bd. of Regents of State Colleges v. Roth*,

408 U.S. 564, 577 (1972). Plaintiffs cannot intentionally fail to comply with the requirements of Title 5's renewal process, the failure of which results in a lapse of a license, and at the same time claim a protected property interest has been violated. *See Hatch v. Boulder Town Council*, Case No. 2:01-cv00071-PGC, 2007 WL 2985001, at *20 (D. Utah Oct. 10, 2017) ("having failed to complete the required steps to obtain a restaurant business license, he cannot now claim that he possessed a protectable property interest in such a license.").

But even if Plaintiffs could show a protected property interest in a license they purposefully failed to renew properly, a takings claim would still not be viable. As with their other takings claims, Plaintiffs do not allege that the Town has physically invaded their property. Nor has the Town engaged in a complete regulatory taking, as Plaintiffs still have the ability to rent their property to tenants for longer than thirty days, occupy it themselves, or sell it. Plaintiffs push back on this point, asserting that because Cabin #3 is small, it is "unsuitable for any type of full-time housing, including workforce housing." [ECF 1, ¶ 119, 143]. This allegation is conclusory, however, and not entitled to the presumption of truth, as Plaintiffs fail to explain how a 300 square foot studio could not be marketed to longer-term residents. [*See* ECF 1, ¶ 19 (describing cabin #3 as a "one room 300 square foot studio…")].[6] In any event, even assuming Plaintiffs would have difficulty finding a long-term renter for their studio, the loss of one type of property use does not result in a takings. *See Lingle*, 544 U.S. at 538.

That again leaves Plaintiffs with the Penn Central factors and whether they can show Title 5's license nonrenewal provision "goes too far." This is a relatively short analysis because

---

[6] Indeed, the Town has no regulations establishing the minimum size of any dwelling unit for habitation. While 300 square feet may seem subjectively small to Plaintiffs, they fail to allege – much less establish – that such a dwelling unit could not be competitively marketed to a long-term renter. In fact, many people live in homes or apartments of a similar size in other high-priced communities.

Plaintiffs cannot show interference with their reasonable investment-backed expectations. Title 5 very clearly spells out the consequences of failing to renew a license and Plaintiffs cannot claim they were surprised by the operation of Title 5 when they consciously chose to properly renew two licenses but not pay the requisite fees on a third license.

In terms of the other Penn Central factors, while plaintiffs claim a reduction in revenue from the loss of short-term rentals for Cabin #3 (*see* ECF 1, ¶¶ 120), they fail to allege the reduction in value in comparison to other uses, such as long-term renting or the sale of the property. Also, with respect to the nature of the Town's actions, the regulation at issue appropriately balances the desire of existing licensees to continue operating their short-term rentals with the fact that the Town has a backlog of property owners who wish to rent on a short-term basis. [ECF 1, ¶ 29 ("There is a significant waiting list for residents of the town in applying for the STR license.")]. By allowing a license to automatically expire for failure to properly renew it, the Town is ensuring that the finite number of licenses are allocated to those property owners who intend to rent their properties in compliance with the law. Plaintiffs do not allege that is an improper government interest.

Although ill-defined, neither Plaintiffs' fifth nor sixth claim for relief alleges a viable takings claim under any recognized theory of the law. As with their fourth claim for relief, they should be dismissed.

     *iv.*    *The Town's actions do not violate the Commerce Clause.*

Plaintiffs' next theory is Title 5 violates the dormant Commerce Clause – an assertion that is fundamentally at odds with U.S. Supreme Court precedent on the same subject. [ECF 1, ¶ 161].

Plaintiffs do not appear to argue that Title 5 treats in-state tourists differently from out-of-state tourists. Nor could they, as the relevant portions of Title 5 treat all tourists the same: they are only able to stay at short-term rentals in Town that have paid all of their fees and are in possession of a proper rental license. *United Haulers Ass'. Inc. v. Oneida-Herkimer Solid Waste Management Auth.*, 550 U.S. 330, 338 (2007) (discrimination requires a threshold showing of "differential treatment of in-state and out-of-state economic interests").

Instead, Plaintiffs appear to limit their Complaint to the dormant Commerce Clause's "undue burden" analysis, which provides an exceptionally narrow window to challenge a state law that does not discriminate against out of state commerce but nonetheless unduly burdens commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). As the U.S. Supreme Court has held, "[s]tate laws frequently survive this *Pike* scrutiny…" *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008).

When evaluating a regulation pursuant to the undue burden test, courts must uphold the regulation "if it serves a 'legitimate public interest,' its effects on interstate commerce are only 'incidental,' and the burden imposed on interstate commerce is not 'clearly excessive in relation to the putative local benefits.'" *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir. 2000).

The "burden" Plaintiffs rely on is Title 5's provision that results in expiration of a rental license if a homeowner fails to properly renew it and pay the associated fees. [ECF 1, ¶ 161]. If that seems like a particularly thin reed upon which to support a claim under the dormant Commerce Clause, that's because it is. Title 5 is nothing more or less than a licensing system that requires property owners to comply with the Town's regulations – incentivizing the active

use of a limited number of short-term rental licenses by ensuring the licenses of noncompliant homeowners are not renewed and the next homeowner in a long waiting list is given the opportunity to apply for a license.

Both the regulation of short-term rentals and the Town's goal of increasing affordable housing are legitimate public interests – so much so that Plaintiffs do not even argue otherwise. The burden on interstate commerce is minimal. Out of state tourists – indeed, all tourists – must rent short-term housing from a licensed homeowner, but are otherwise free to select whatever accommodations fit their needs. Also, because the expiration of one license makes another license available to the next homeowner on the waiting list, the expiration of Plaintiffs' rental license for Cabin #3 arguably had no effect on interstate commerce, *i.e.*, the same number of accommodations remain available for all tourists. Finally, Title 5's expiration provision is clearly not excessive in relation to its local benefits. A short-term rental operator need only pay their fees on time, as Plaintiffs competently did for many years for all three properties and performed equally as well for two out of three properties in 2023. The fact that they intentionally failed to pay fees for Cabin #3 in 2023 does not transform Title 5's licensing requirements into an unreasonable burden on commerce in violation of the dormant Commerce Clause.

Plaintiffs' seventh claim for relief should thus be dismissed.

vi.      *The Town did not violate the Contracts Clause.*

In its final constitutional claim, Plaintiffs assert that the Town's imposition of the linkage fee for Cabin #3 violates the Contracts Clause of the both the U.S. and Colorado Constitution. [ECF 1, ¶¶ 174-76].

As a threshold matter, Plaintiffs appear to limit their challenge to Cabin #3, as they fail to mention any existing contracts for Cabins #1 and #2. [*See id*. (discussing only Cabin #3)]. But of course, Plaintiffs *didn't pay* the full fee for Cabin #3, so they can hardly complain that the fee had an effect on existing contracts with customers. Based on this reason alone, Plaintiffs' claim should be dismissed.

For the sake of argument, the Town will assume that Plaintiffs meant to address the linkage fee for their other two cabins – an assumption that leads to dismissal all the same. As an initial matter, the scope of Plaintiffs' claim is exceedingly narrow. The Contracts Clause applies only to existing contracts that were executed prior to legislation taking effect – it does not apply to contracts that have yet to be formed. *See, e.g., General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (holding that first inquiry is "whether there is a contractual relationship"). Importantly, while the Town passed the linkage fee in March 2022, it delayed implementation of the fee until the 2023 license year. [*See* ECF 1, ¶ 4 ("The annual fee commenced January of 2023…")]. Thus, the only short-term rental agreements that theoretically could have been affected by Title 5's passage were those that were executed before March 2022 for reservations beginning in January 2023 or later. For any reservations executed after March 2022, Plaintiffs had advanced warning of the linkage fee – and advanced knowledge of the consequences of failing to pay the fee – and thus cannot raise any argument under the Contracts Clause. Plaintiffs do not state how many customers booked reservations almost a year in advance (*i.e.*, before March 2022 for a reservation in early 2023), undercutting any argument of a substantial impact on their future revenue and income.

Notwithstanding this critical omission from the Complaint, courts generally apply a two-part test in determining whether a statute violates the Contracts Clause: (1) whether the "law has, in fact, operated as a substantial impairment of a contractual relationship," and (2) if a substantial impairment is present, the municipality "must have a significant and legitimate public purpose supporting the regulation. *DC Automotive, Inc. v. Kia Motors Am., Inc*, 411 F. Supp. 3d 1137, 1143 (D. Colo. 2019) (citing *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 401 (1983)).

While Plaintiffs claim the interference to their existing reservations is "substantial," they offer only conclusory assertions to that effect, devoid of any facts that would entitle those conclusions to the assumption of truth. In fact, the Plaintiffs provide *no facts* in support of their primitive conclusion that Title 5 "results in substantial financial damage and loss to Plaintiffs, including rental income loss and property resale value…" [ECF 1, ¶ 178].[7] The only financial calculations provided in Complaint actually come from the Town's own study, in which it was noted that the linkage fee would have a negligible 2.6% levy rate on a typical short term rental. [ECF 1, ¶ 19].[8]

Beyond a 2.6% fee, Plaintiffs do not establish literally any other effect on any existing reservations with customers. Plaintiffs may rent to whomever they wish, for any duration, and may even pass along the fee to customers, as stated expressly in Title 5. [*See* Ex. A, p. 16, § 5.20.120(d)]. In the absence of any facts supporting their conclusion that Title 5 has a substantial impact on their operations, Plaintiffs' Contracts Clause claim fails on the first element of the test.

---

[7] "Property resale value" is not a relevant consideration for substantial impairment under the Contracts Clause (at least not in this case), as there is no allegation that the Plaintiffs were under contract to sell any of their property when Title 5 came into effect.

[8] Plaintiffs dispute this calculation with respect to Cabin #3, which, again, they failed to pay the fee for anyways.

But even if the Court were to proceed to the second element, there is a "significant and legitimate public purpose" undermining Title 5. As the Title states directly, and Plaintiffs do not dispute, the Town has a dire shortage of affordable workforce housing. [ECF 1, ¶ 5]. While Plaintiffs attack the imposition of the linkage fee on short-term rental operators under various constitutional theories, for purposes of the Contracts Clause, they do not dispute the validity of Title 5's public purpose.

Two final points extinguish any doubt as to the validity of Plaintiffs' claim. First, the Town's linkage fee does not regulate or alter a contract between the Plaintiffs and the Town; rather, it concerns only contracts between Plaintiffs and third parties. Under well-established U.S. Supreme Court precedent, "[u]nless the State itself is a contracting party…[a]s is customary in reviewing economic and social regulation...courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 412-13 (1983). Under this deferential standard, there is no ability for Plaintiffs to claim that a fee averaging only 2.6% of gross revenue is unreasonable in light of the Town's legitimate and urgent need for affordable housing.

Second, short-term rentals were already subject to licensing fees and regulations in the Town; thus, Plaintiffs had no reasonable expectation that their licenses would remain free from further regulation in the future. Again, under well-established U.S. Supreme Court precedent, a regulated industry cannot act surprised and turn to the Contracts Clause when regulations on the same subject matter arise in the future. *See Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the

particular to which he now objects, he purchased subject to further legislation upon the same topic.").

Given the conclusory allegations in Plaintiffs' final constitutional attack on Title 5, their Contracts Clause claim should be dismissed.

## CONCLUSION

For the reasons stated herein, all six of Plaintiffs' constitutional claims should be dismissed.

DATED this 17th day of July, 2023.

*s/Nick Poppe*
J. Andrew Nathan
Ashley Hernandez-Schlagel
Nicholas C. Poppe
NATHAN DUMM & MAYER P. C.
7900 E. Union Avenue, Suite 600
Denver, CO 80237-2776
Telephone: (303) 691-3737
Facsimile: (303) 757-5106
ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on 17th day of July, 2023 I electronically filed the foregoing **PARTIAL MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(B)(6)** using the CM/ECF system which will send notification of such filing to the following:

Jennifer M. McCallum, Ph.D., Esq.
The McCallum Law Firm, P.C.
685 Briggs Street
Erie, CO 80516
(303) 828-0655
jennifermccalum@mccallumlaw.net
katman@mccallumlaw.net
*Attorney for Plaintiffs*

*s/Nick Poppe*

J. Andrew Nathan
Ashley Hernandez-Schlagel
Nicholas C. Poppe
Attorneys for Defendant
NATHAN DUMM & MAYER P.C.
7900 E. Union Avenue, Suite 600
Denver, CO 80237-2776
Telephone: (303) 691-3737
Facsimile: (303) 757-5106
ANathan@ndm-law.com
ASchlagel@ndm-law.com
NPoppe@ndm-law.com