**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-CV-01349-SBP

RICHARD GRIGSBY,
CHERYL GRIGSBY, AND
ROCKY MOUNTAIN MEMORIES, INC.
           Plaintiffs,

    v.

ESTES PARK, COLORADO, A COLORADO MUNICIPAL CORPORATION

        Defendant,

---

**PLAINTIFFS RESPONSE TO PARTIAL MOTION TO DISMISS**

---

      Plaintiffs, Richard and Cheryl Grigsby and Rocky Mountain Memories, Inc., by and through their counsel, McCallum Law Firm, P.C., hereby submit their response to Defendant's Partial Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) with supporting authority as follows:

**INTRODUCTION AND SUMMARY OF ARGUMENT**

      Plaintiffs agree with Defendant that the Town of Estes Park (the "Town") has an affordable housing problem but disagrees that short-term rentals are the cause of the shortage as many factors are at play contributing to the shortage of affordable housing.  One such factor is that there are only 4,380 housing units located in the Town that had a full-time population of 5,886 as of 2020. (Estes Valley Housing Needs Assessment & Strategic Plan, Root Policy Research, January 2023, Section 1, p. 2 (p. 24), hereinafter ("Root Study")) This is a small number of units for a town of this size.  Of the 4,380 units, only approximately 10% (480) of them are currently short-term rental vacation homes. (Id. at Section III, p. 6 (p. 49)) The Town

1

also has an older population with 40% of an age of at least age 65 or older.  (Id. at Section I, p. 3 (p.25)) This demographic reflects the fact that the Town has become a retirement community with wealthy retirees moving to the area who are easily able to purchase homes.  Additionally, those who own homes and are still working, as of the last census in 2020, have an average median household income of $82,222. (Id at Section I, P. 8 (p.30)) This high median income of home owners reflects the fact that working residents have an income that allows them to purchase a home. Additionally, creation of new housing stock has proven to be extremely difficult and has been at 7% from 2010 and 2020 – the lowest rates since the 1960s.  (Id. at Section III, p.2 (p.45)) Even the Town's two-year effort to partner with a developer to build 190 affordable housing units on town-owned property failed, despite having a $2 million allocation from the County's American Rescue Plan Act (ARPA) (Town of Estes Park Press Release dated July 25, 2023) The Town also has a significant number of second home owners who do not rent their homes. (Root Study at Section III, p.2 (p.45))   So, there are many factors contributing to a shortage of affordable housing units including the fact that the Town is becoming a haven for retirees with sufficient funds to purchase a home; the median income of residents is high allowing them to purchase a home; the limited number of units (4,380) hasn't been increased in decades and the fact that development of new units is difficult in the Town (evidenced by the Town's own efforts to partner with a developer to build affordable housing units utilizing $2 million of ARPA funds recently failing).  It is simply inaccurate for the Town to blame the shortage of affordable housing units on those who operate short term rental vacation homes as the shortage is a complex, multi-faceted problem.

Additionally, contributing to the problem of a lack of affordable housing is desirability. The average sales price of homes in the Town is well beyond the reach of anyone needing affordable housing.  The median sale price of a home in the Town rose from $392,000 in March 2020 to $585,000 in September of 2022. (Id. at Section III, p.7 (p. 54)) That is in stark contrast with the median income in 2020 of renters in the Town that was $30,766, making it extremely difficult for those who are current renters to qualify for a loan to purchase a home of their own. (Id. at Section I, p. 8 (p. 30))

An additional factor in the shortage of affordable housing is the high monthly rental rate in the Town.  The median income for Town residents renting is $30,766, equating to a monthly rent that should not exceed $769 in order to be deemed "affordable housing."[1]  The average rent amount in the Town, however, far exceeds this at $1,450 for a two-bedroom apartment with many units having much higher per month rents[2].

Another factor contributing to the lack of affordable housing units are vacation units rented on a long-term basis (longer than 30 days).  The Town is attractive to guests of the Town that wish to vacation there for more than 30 days but less than one year.   According to one report from a local property management company, long-term rental data for the 2021-2022 year resulted in an average rental rate of $9,000 (an effective monthly rate of $7,500) for a 2-bedroom unit for a 36-day stay, $8,349 (an effective rate of $6,591) for a 3-bedroom unit for a 38 day stay

---

[1] Per the U.S. Department of Housing and Urban Development, affordable housing is generally defined as rent not exceeding 30% of the household income.  See https://www.huduser.gov/portal/pdredge/pdr-edge-featd-article-081417.html
[2] Per Zumper Inc., this figure is a 437% increase in average rental costs compared to the previous year.  See https://www.zumper.com/apartments-for-rent/estes-park-co?property-types=4,15,5,14,9

and anywhere from $11,040 to $28,400 (an effective rate in the range of the above noted amounts) for stays ranging from 41-142 days. Clearly, this is not "affordable housing!"

An additional factor contributing to the lack of affordable housing units is that tourism has increased in the Town over time, especially in recent years.  This increase has required additional workers to provide services to the Town's guests.  As evidenced by a report prepared by Dean Runyan Associates tourism spending increased from $342.7 million in 2020 to $504.3 million in 2021.[3] Workers in shops, restaurants, hotels, tour companies, and the like all need affordable housing and, as tourism has increased, the number of businesses in Town that need housing for their workers has also increased and the need is estimated to be "2,720 units … by 2030 to address the current shortage of workforce housing and forecasted employment demand." (Complaint ¶ 5 citing Root Study at Section III, p. 1 (p. 44))

Ironically, although owners of short-term rental vacation homes in the Town make up only about 10% of the 4380 units in the Town, they contribute financially to the Town more than any other property owner because they not only pay property taxes, but also contribute vast amounts of money back into the Town through licensing fees and sales and lodging taxes (likely also encouraging substantial tourism dollars).  All other property owners generally only pay property tax.

Despite those who own short term rental vacation homes already financially contributing more than any other property owner of the Town, they are the only type of property or business

---

[3] Per the summary of the report presented on the official Visit Estes Park Website.  See https://www.visitestespark.com/articles/post/new-data-shows-tourism-continues-to-positively-impact-economy-in-estes-park/#:~:text=Prepared%20by%20Dean%20Runyan%20Associates,to%20%24504.3%20million%20in%202021.

owner assessed an additional fee to "help" with the affordable housing problem.  The March 22, 2022 Ordinance 02-22 amendment to Title 5 ("Ordinance 02-22") imposing an annual "vacation home workforce housing regulatory linkage fee" ("Impact Fee") (Title 5.20.120) in the amount of $1,390 on annual Vacation Home Rental Registrations ("Vacation Home Rental License") (Title 5.20.030(6)) specifically states that its purpose, "…is to protect the public health, safety, and welfare of the people of the Town by perfecting a comprehensive regulatory program linking the operation of vacation homes with the need for and provision of workforce housing." (Ordinance No. 02-22 5.20.120(a)(1), emphasis added) Despite already contributing to the Town's property, sales, lodging, local, state, and marketing district tax revenue, short-term vacation homeowners were the only property or business owners asked to pay another approximately $608,820 per year.[4]  The Town failed to provide any evidence "linking" short term rental vacation homes to the affordable housing shortage.  Importantly, the projected generated revenue does very little to solve this concern as the amount generated is projected to be approximately 0.05% of the funds required to solve the problem.  As discussed above, there are many causes "linked" to the affordable housing problem and in no way could the affordable housing problem be construed to be the fault of short-term rental owners.   This is far from "mathematical nicety" argued by the Town and flies in the face of any rational basis. Additionally in Plaintiffs case, their Cabin #3 was uninhabitable when they purchased it and, prior to restoration, was not functional for any use, let alone affordable housing.

---

[4] The Root Study cites 438 short term rental units multiplied by $1390, as cited in the Ordinance, equal $608,820, not taking into account units that may be exempt.

Ordinance 02-22 was passed in reliance on a study prepared by Root Policy Research and presented to the Town's Board of Trustees on March 22, 2022.  The Town states that the Root Study, "demonstrates that the continued operation of vacation homes has a detrimental impact on the availability of workforce housing within the town, and quantifies the impact on the availability of workforce housing within the town, as well as the funds required to address the impact, at thirteen hundred ninety dollars ($1390) per vacation home per year." (Title 5.20.120(a)(3)) The Town additionally states, "[a]ccordingly, the continued operation of vacation homes will cause the Town to incur costs of addressing workforce housing needs." (Id.) As discussed above, the premise stated in Ordinance 02-22 is simply not true.  Many factors in the Root Study are cited as detriments to the availability of affordable housing units that may also cause the Town to incur costs associated with addressing workforce housing needs, such as the Town becoming a retirement community; the median income of homeowners being high when compared to those who rent making it difficult for renters to qualify for financing in order to become home owners; the extreme shortage of any type of housing unit, let alone affordable housing units; the fact that sale prices of homes are well-beyond what would be considered affordable housing; the fact that the Town is experiencing hurdles associated with development causing the number of units of any type, let alone affordable housing units, to not increase for decades; and the fact that monthly rental rates for yearly, short-term and/or long-term rentals are all well-beyond the definition of affordable housing.  Additionally, the need for affordable housing for workers has increased as the tourism industry in the Town has increased over the years.

The Town's Board of Trustees blatantly ignored the actual findings and rationale in the Root Study and chose to place the fee <u>only</u> on short-term rental vacation homes despite all of the other factors cited as playing a part in the shortage of affordable housing in the Town.  This targeted focus on short term rental vacation homes is misplaced, especially considering the decline in freely available housing units out of the 4380 total units and the fact that the need has gone up with little to no development of new units.  Additionally ironic is that the Town itself was unable to contribute to the affordable housing problem by partnering with a developer utilizing $2 million of ARPA funds to create 190 new units on Town owned land.  Despite not being able to produce new affordable units itself, the Town is irrationally pointing the finger solely at short-term rental vacation home owners as the only class of property or business owners who should pay to help the problem (despite already paying more than any other class of property or business owner in additional sales tax and licensing fees).  The Town's Board completely ignored the effect of the retired and high-income home owners, the long-term rental home owners, the second home owners and the increase in demand created by business owners on the availability of and need for affordable housing units.  None of these factors were cited as "linked" to the need for workforce housing, despite the findings of the Root Study.  Additionally, there is no mention of the lack of units and/or the Town's role in making it difficult for developers to get through the entitlement process with the Town in order to build new units. There was absolutely no acknowledgement by the Town of its part in making the development process difficult within the Town, which contributed to little to no creation of any new units, let alone affordable housing units, for decades.

In sum, there was an irrational, targeted focus on short term rental vacation homes even though the Town's own study found the problem to have many significant factors contributing to the problem and that short term rental vacation homes were not one of them.  The reality of the housing market in the Town is that even if short term vacation homes were altogether prohibited and the owners of all 438 homes either sold or rented them long-term, they would likely sell or rent at a price that would never qualify as affordable housing.

Plaintiffs have lawfully owned and operated three short term rental vacation homes in the Town for several years without incident.  Upon implementation of Ordinance 02-22, Plaintiffs tried, unsuccessfully, to engage in discussions with the Town regarding the Impact Fee imposed upon only a small and distinct class of property and small business owners (i.e., short term rental vacation homes) despite the problem of affordable housing being complex and multi-faceted. Since this matter proceeded without vote and hearing, Plaintiffs then used the only remedy available to them to protest the Impact Fee as being improper and unconstitutional – they notified the Town that they desired a hearing on the matter to argue the ordinance was invalid or, in the alternative, that the exemption applied to them.  Instead of granting Plaintiffs the relief they sought, the Town immediately and punitively revoked Plaintiffs' short-term rental license for failure to pay the Impact Fee and refused to grant them a hearing on the matter or allow them to cure the late payment, effectively failing to provide them with due process and a taking of their property.

The Impact Fee fails to address and solve the complex, multi-faceted workforce affordable housing crisis present in the Town that affects all business owners and not just the 10% of home owners who rent their homes on a short-term basis while disparately treating them

differently from other similarly situated real property owners while infringing on their right to use and enjoy their bundle of property rights to meet investment expectations.  Plaintiffs also assert the Town's Board ignored the findings of its own commissioned Root Study that detailed the many factors associated with the unavailability of affordable housing, including the lack of development of new units.  Furthermore, the Town's refusal to allow Plaintiffs to cure the late payment or provide them with the procedural protections guaranteed to property owners has resulted in a regulatory taking of their property.

## RELEVANT LEGAL STANDARD

A complaint must allege "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555.  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id*. at 558.  A Court must review the facts of the Complaint and construe those facts in the light most favorable to the Plaintiff. *Id*. See also, *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp.2d 1219, 1222 (D. Colo. 2009).  A court may not dismiss a complaint merely because it appears unlikely or improbable that a plaintiff can prove the facts alleged or ultimately prevail on the merits. *Twombly* at 556.  Instead, a court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id*. at 556.  If, in view of the facts alleged, it can be reasonably conceived that the plaintiff could establish a case that would entitle the plaintiff to relief, the motion to dismiss should not be granted. *Id*. at 563 n. 8.  Granting a motion to dismiss is a "harsh remedy" that

should be "cautiously studied" to "effectuate the liberal rules of pleasing" and "protect the interests of justice." *Dias v. City & Cty. Of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotations omitted).

The Fourteenth Amendment to United States Constitution provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const. amend. XIV)  No State shall "deny to any person within its jurisdiction the equal protection of the laws 'which is essentially a direction that all persons similarly situated should be treated alike.'" (*City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982))

To plead a count for Equal Protection, federal courts generally require that (1) the party must have been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment.  (*Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, (2000) A plaintiff will fail to prove the claim if there is a rational basis for the difference in treatment or there is a material difference between the plaintiff and others similarly situated.  (*Planned Parenthood As''n of Utah v. Herber*, 828 F.3d 1245 (10th Cir. 2016)).  General and conclusory allegations that one is merely being treated differently from others without identifying specific examples of similarly situated individuals is usually insufficient to defeat a motion to dismiss. (*Comprehensive Addiction Treatment Center, Inc. v. Leslea*, Civil Action No. 11-cv-03417, (D. Colo. Jan. 31, 2013).

The Commerce Clause of the United States Constitution gives Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." (U.S. Const., art 1, § 8, cl 3) This Commerce Clause gives Congress the broad power to regulate interstate commerce and restrict states from impairing interstate commerce. The dormant Commerce Clause is an implicit restraint on state authority to regulate interstate commerce, even in the absence of a conflicting federal statute. (U.S. Const. art. 1, § 8, cl. 3) Two primary principles mark the boundaries of a state's authority to regulate interstate commerce under the dormant Commerce Clause: a state may not discriminate against interstate commerce and may not impose undue burdens on interstate commerce. (*Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (2022)).  In this circuit, a state statute may violate the dormant Commerce Clause in three ways. (*Energy Amp Env't Legal Inst. v. Epel*, 43 F.Supp.3d 1171 (D. Colo. 2014)) First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. (*Id*. at 1177, citing *KT & G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir.2008)) Second, a statute will be invalid *per se* if it has the practical effect of controlling commerce occurring entirely outside the boundaries of the state in question. (*Id*.)  Finally, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated if it imposes a burden on interstate commerce which is not commensurate with the local benefits secured. (Id. at 1177, citing *Pike v. Bruce Church Inc*., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970))

**LEGAL ARGUMENT**

i.    *Violation of Equal Protection Claim (Plaintiff's Third Cause of Action)*

As noted above, Plaintiffs have proffered sufficient facts to state a claim under the *Twombly* standard. Plaintiffs have alleged numerous instances where it, a short-term rental homeowner in the Town, has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. Plaintiffs go to great length to establish how they are treated differently than other similarly situated residents by demonstrating how the Impact Fee is only charged to those who rent their homes for 30 days or less and is levied against existing licensed vacation homes as a condition of license renewal. As a few examples, the Impact Fee does not equally distribute the costs of workforce housing among the persons and businesses benefited thereby (Complaint, ¶4), does not consider "atypical" tiny seasonal cabins like Plaintiffs' Cabin # 3 that is a one room 300 sq. ft. studio (Complaint, ¶19), disparately treats vacation homeowners who rent for less than 30 days compared to vacation homeowners who rent their homes for 30 days or more and there is no legitimate government interest. (Complaint, ¶77 and ¶95)

Clearly meeting the first element in pleading its counts for equal protection, the core of Defendant's argument is that Rule 12(b)(6) is not satisfied due to the rationale basis prong. This argument is surprising because the Complaint is replete with examples of the how Ordinance 02-22, passed without vote, is arbitrary and not tied to its intended purpose. As alleged in the Complaint, at a minimum, Ordinance 02-22 ignores its own study that was commissioned to support the amendment, will serve little purpose in addressing the crisis it is intended to control, is replete with self-interest, affords the Town unfettered and unreasonable control to act at whim

(as specifically shown against Plaintiffs), has no nexus to the costs imposed, is absent a plan to address the intended purpose, does not bear a reasonable relationship to the direct or indirect costs to the Town of providing the service or regulating the activity of licensed vacation homes and is not reasonably related to the specific government expenditure.

Plaintiffs agree with Defendant in that the inquiry for whether there is an equal protection violation or not is that there must be a reasonable basis that furthers a government interest. *Dandridge v Williams,* 397 U.S. 471, 485 (Colo. 1970).  Plaintiffs' argument is that there is no rational basis, and the Town has not presented reasonable evidence, that short term rental vacation homes alone have a detrimental impact on the government's interest in ensuring the availability of workforce housing within the town. (Title 5.20.120(a)(3)) In fact, it is quite the opposite, as discussed above, the affordable housing problem in the Town is a complex, multi-faceted problem resulting from an extremely low number of units (4380); the desirability of the area for retirees, those who are still working, second-home owners and long-term rental owners. There are also development hurdles, implemented and mismanaged by the Town, hindering the construction of new units.  Plaintiff argues that even if all 438 short term rental vacation home owners ceased operations and sold or rented their units, the sale price or rental rate would be well-beyond that of an affordable housing unit.

Defendant focuses on the duration of stay when concluding that those who visit the Town on vacation will stay for fewer than 30 days while those who desire to live and work in the Town will seek out a lease longer than 30 days, including seasonal workers who seek up to 180 days. In the Town's particular market, this is simply not true as visitors will often stay more than 30 days to vacation.  Additionally, many of the units rented for this purpose are the exact same units

rented on a short-term basis.  In other words, the short-term rental vacation homes rented on a short-term basis are often also rented on a long-term basis. The Town's market is unique and the exact same homes situated for short-term rental use are also almost always situated for long-term rentals.  *See Murphy v Walworth Cnty.,* 3831 Supp. 3d 843, 851 (E.D. Wis 2019).  In other words, contrary to Defendant's assertions, the two types of rental uses defined by the Town (short-term and long-term) do not require different housing stock and are often the same unit making them, *per se*, similarly situated.

Contrary to Defendant's claim, Plaintiffs additionally assert there is no evidence that short-term rental vacation homes have any effect on the availability of affordable housing units and, as such, do not pass rational basis review.  This one disputed example supports that Plaintiffs have met the pleading standard set forth in *Twombly* as the rationale basis is clearly in question as properly pled. As the Town's own study showed, the problem is complex and includes a variety of factors unique to this market.  Defendant's arguments fail to appreciate the conclusions of its own study, which clearly show that the 10% of available housing units that currently rent on a short-term basis is an insignificant number when compared to the number of units taken out of service due to the Town becoming a desirable retirement and working homeowner haven.  Additionally, those that are actually long-term rentals have rates well-beyond the affordable rental criteria.  There is also a short supply of units and little to no new construction of units, let alone those that meet the affordable housing criteria.  Additionally, many times the exact same homes are rented on both a short-term and long-term basis with the Impact Fee only being imposed when a home is rented on a short-term basis, which does not satisfy rational basis review.

Defendant cites a variety of instances where other municipalities have enacted ordinances specific to short-term rentals. While the cases it relies on are from 2018, 2021, and 2022, Defendant guides the Court that "Plaintiffs ignore long standing and uncontroversial principles of equal protection." (DE 13, p. 8) This is simply not true as the cited cases do not have a bearing on this case. For instance, Forsyth County in Georgia enacted legislation prohibiting short-term rental vacation homes in certain zoning districts of the county.  *Short Term Rental Owners Assoc. of Georgia, Inc. v. Cooper*, 515 F. Supp. 3d 1331, 1337 (N.D. Ga 2021) This legislation has no bearing to this case as it was directed to the location of short-term rentals per the County's zoning map and dealt with controlling traffic and maintaining the character of particular neighborhoods.  Additionally, Defendant cites a case in New Buffalo, Michigan where the court found that "long-term rentals… connote a permanency of residence akin to a homestead residence." *Moskovic v City of New Buffalo*, Case No 1:21-cv-144, 2022 WL 16548948 (W.D. Mich. Oct 31, 2022).  Due to the unique nature of the Town's market, there is not a lot of "permanency" in its long-term rentals due to the seasonal visitors who enjoy stays more than 30 days but less than a year.  Defendant also cites a case from Walworth County that is, again, not relevant, as that court, analyzing an equal protection challenge, found the homes rented for a short-term were not similarly situated to those rented for a long-term, which is in contrast to this case where the single-family homes utilized as short-term rental vacation homes <u>are</u> similarly situated as those used for long-term and are often the exact same units rented on both a short-term and long-term basis. *Murphy v. Walworth County,* 383 F. Supp. 3d at 851.

Defendant fails to understand that the exact same housing unit is rented on both a long-term and short-term basis. The booking sites for short-term rentals in this market all allow for

bookings less than 30 days, as well as more than 30 days.  The Town simply fails to understand that their own rental housing market is unique due to the proximity to Rocky Mountain National Park and the desirability of the area for both short-term and long-term rentals.  Although many factors play into the lack of affordable housing units in the Town, it is a violation of Plaintiffs right to equal protection to charge the Impact Fee when it rents its units on a short-term basis and not to those who rent on a long-term basis.

Plaintiffs respectfully request their third claim for relief be retained as Plaintiffs have sufficiently pled a cause of action for a recognized form of takings in accordance with the *Twombly* standard.

### ii.    *Violation of Substantive Due Process (Plaintiff's Fourth Cause of Action)*

In the Complaint, Plaintiff alleges that there was a regulatory taking of the property on which Cabin #3 sits when its short-term rental license permit was revoked due to a regulatory action that deprived it of all economically beneficial use of the property and also because the regulatory action went "too far."  *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104 (1978)

As noted above, Plaintiffs have proffered sufficient facts to state a claim under the *Twombly* standard.  Plaintiffs have alleged numerous instances where it, a short-term rental homeowner in the Town, has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  Plaintiffs go to great length to establish how they are treated differently than other similarly situated residents by demonstrating how the Impact Fee is only charged to those who rent their homes for 30 days or less and is levied against existing licensed vacation homes as a condition of license renewal. Of particular note for this claim for relief, are the aforementioned general allegations regarding intentional different

treatment from others similarly situated and the lack of rational basis, but more importantly, the specific allegations related to the one room 300 sq. ft. studio Cabin #3 (e.g., Complaint, ¶19, ¶28, ¶29, ¶30, ¶115, ¶116, and ¶161)

Again, meeting the first element in pleading this cause of action, the crux of Defendant's argument turns to the rational basis.  Defendant asserts that the factual contentions do not rise to a complete regulatory taking because loss of Plaintiffs' rental license doesn't stop Plaintiffs from selling their property, renting it long-term or living in it themselves.  As sufficiently alleged in the Complaint in accordance with the standard set forth in _Twombly_, this is simply untrue.  As Plaintiffs will show, Cabin #3 sits on the same lot as Cabins #1 and #2.  It is also 300 square feet and has zero storage for any belongings.  It does not have a full kitchen.  Cabin #3 has a simple hot plate, microwave, a tiny dorm-sized refrigerator, and a small sink.  Cabin #3 does not have a washing machine, drier or a closet or dresser. There is simply no way someone could live there for more than a few days because there is nowhere to store food, clothing, dishes, and other essentials.  It is simply an extremely small studio, "room" with very little to offer beyond a comfortable place to stay and enjoy the beauty and benefits of the Estes Valley.  Cabin #3 does not have sufficient heat for the winter months and is not sufficiently winterized (or have the space) to install a heating system.  In no way could someone live in Cabin #3 full time as a renter, workforce housing, or otherwise.  Additionally, Cabin #3 is located on the same lot as Cabins #1 and #2 that do have a short-term rental license and it also has a connected roof, connected plumbing and is on the same meter as Cabin #2 rendering it incapable of being sold on its own.   The loss of the short-term rental license essentially deprived Plaintiffs of all economic use of the property.

While Defendants allege that the _Penn Central_[5] factors are not met, it is clear that the Complaint alleges sufficient facts to get the parties to the _Penn Central_ test when it is ripe. But for the sake of completeness, Plaintiff notes that the facts pled are sufficient for a _Penn Central_ analysis at the present time. Defendant asks the Court to ignore the economic impact of the regulation on the Plaintiff and the extent that the regulation has interfered with investment-backed expectations and the character of the governmental action – but isn't that the very issues that the Complaint brings to light.

Defendants allege that Plaintiffs didn't address the issue of the economic impact of the regulation on the profits of Cabin #3. Plaintiffs respectfully disagree with this contention as it is Plaintiffs stance that they disagreed with the Impact Fee as an additional burden to the profitability of their business – it was not rational and intentionally treats Plaintiffs differently from others similarly situated. Plaintiffs attempted to contest the Impact Fee as they had already submitted to the payment of a yearly license fee and sales tax on rent received. As discussed above, Plaintiffs also did not agree with the validity of the enacted ordinance and had expected to have their day in court via their request for a hearing to discuss it. Additionally, the loss of the rental permit license for Cabin #3 significantly decreased the economic value of the lot it sits on that also has Cabin #1 and #2 on it. There was an immediate and instant economic loss due to the loss of future short-term revenue from Cabin #3 as there are no other uses for it due to its size and lack of heating, storage, a kitchen, and a full bathroom.

---

[5] In its Motion, Defendant states "[b]ecause Plaintiffs do not allege a physical takings of their properties, they are relegated to one of two forms of regulatory takings: (1) a regulatory action that deprives the owner of all economically beneficial use of their property, or (2) a regulatory action that goes "too far," considering the factors set forth in Penn Central Transp. Co. v. City of New York¸438 U.S. 104 (1978). (DE 13, p.8) Plaintiffs don't specify which form of regulatory takings they wish to advance, but under either theory, Plaintiffs lack of a viable claim. (_Id._)

Plaintiffs again allege they had a reasonable investment-backed expectation based on interactions with the Town over many years as they developed their property.  Contrary to Defendant's allegations, which are not pertinent to the issue before the Court of the present Motion to Dismiss, Plaintiffs actually did not believe they would be free from future regulation but, instead, felt they would be free from unreasonable legislation, which is the case with the Impact Fee.  Plaintiffs merely wanted to request a hearing to be heard on this issue prior to paying the fee or, alternatively, to be allowed to pay the fee and then have a hearing.  How else does one contest something he or she feels is improper without requesting a chance to be heard on the issue?  Ordinance 02-22 had been enacted March 22, 2022, without vote, and this was the first year in which short-term rental vacation home owners had to pay it.  There was no other mechanism to contest it other than to do so upon it becoming due the first year.  Plaintiffs had a reasonable expectation investment-backed expectation that they could operate their short-term rental vacation home free from, "unreasonable" fees and merely wanted the chance to be heard at a hearing.  Instead of granting Plaintiffs a hearing, the Town revoked their short-term rental permit effectively shutting the business down.

In terms of the _Penn Central_ test, Plaintiffs, in their Complaint, repeatedly allege that the character of the government action was misdirected in enacting Ordinance 02-22.  Ordinance 02-22 will not be effective on its face at providing any type of meaningful solution to the affordable housing problem.  As stated, the Town ignored the findings of its own study.  The study clearly showed there are many factors associated with the lack of available affordable housing units, including the fact that the Town had become a retirement and working homeowner haven, the sales price and long-term rental rates of homes had increased well-beyond the criteria for

affordable housing, there was a lack of new units being built and even the Town couldn't make affordable housing work as they had failed to partner with a developer in combination with $2 million of ARPA funds to create 190 new units.  The problem is complex and unique to the Town as the market has factors not seen in other locations. Additionally, the estimated revenue from the Impact Fee is only $608,821 in contrast to a problem that is estimated to need at least one hundred million to be solved.  Considering the Town couldn't build one affordable housing unit, let alone 190, with $2 million dollars, it seems fair to state the character of the government's action was misdirected when it targeted just one class of property and business owners when it enacted Ordinance 02-22.

Plaintiffs respectfully request their fourth claim for relief be retained as Plaintiffs have sufficiently pled a cause of action for a recognized form of takings in accordance with the *Twombly* standard.

iii.     *Violation of Substantive Due Process (Plaintiff's Fifth and Sixth Causes of Action)*

Defendant collectively argues that Plaintiff's Fifth and Sixth Causes of Action should be dismissed for the same reasons that are substantially the same as the reasons it raised for the other claims for relief.  When arguing that Defendant does not understand the distinctions between the claims for relief and further attempting to turn its Motion to Dismiss into premature Motion for Summary Judgment, Defendant turns to the factual allegations of the Complaint to make its point:

> … in both claims Plaintiffs allege that they paid a certain portion of the Town's overall licensing fee for all three of their cabins, but then admit they only paid the linkage fee portion for Cabin #1 and Cabin #2 – intentionally forgoing payment on Cabin #3. [ECF 1, ¶¶ 115, 139]. Plaintiffs then allege in conclusory fashion that the Town "punitively revoked" the license for Cabin #3 based on nonpayment of the linkage fee. [Id., ¶¶ 116, 140]. Plaintiffs then complain that they were unable to cure their intentional decision to

forgo payment on Cabin #3, either through late payment or a hearing, resulting in the loss of a business license for that specific vacation home. [Id., ¶¶ 117-18, 141-42]. They claim the resulting loss of a license prohibits them from using the property in violation of the Fifth Amendment. [Id., ¶¶ 122, 152]. (DE 13 p 12)

Losing sight of its purpose in this filing, Defendant acknowledges the extent of the well-pled allegations as they relate to this claim for relief.  Like prior claims for relief Plaintiffs have proffered sufficient facts to state a claim under the _Twombly_ standard.  Plaintiffs have alleged numerous instances where it, a short-term rental homeowner in the Town, has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  Plaintiffs were denied their license for failure to pay the Impact Fee, which substantially impacts Cabin #3, and deprives Plaintiffs of their investment.

Defendants again turn to the _Penn Central_ factors, concentrating on the economic impact.  As noted above, Plaintiffs allege in the Complaint that the Impact Fee is an additional burden to the profitability of their business.  The Impact Fee is not rational and intentionally treats Plaintiffs differently from others similarly situated.  Plaintiffs attempted to contest the Impact Fee but were denied a hearing to discuss it.  Plaintiffs suffered an immediate and instant economic loss due to the loss of future short-term revenue from Cabin #3 as there are no other uses for it due to its size and lack of heating, storage, a kitchen, and a full bathroom.  As alleged in the Complaint, Plaintiffs had a reasonable investment-backed expectation.  In addition, Plaintiffs, in their Complaint, repeatedly allege that the character of the government action was misdirected in enacting Ordinance 02-22 as it does not provide a meaningful solution to the affordable housing problem and ignores the Root Study. There are many factors associated with the lack of available affordable housing units, but Ordinance 02-22 targets one class of property and business owners.

Plaintiffs respectfully request their Fifth and Sixth claims for relief be retained as Plaintiffs have sufficiently pled the Fifth and Sixth cause of action in accordance with the *Twombly* standard.

iv.     *Violation of Commerce Clause (Plaintiff's Seventh Cause of Action)*

Plaintiffs assert that they have pled sufficient facts in accordance with standard set forth in *Twombly* to plead a claim of relief under the Commerce Clause. To survive the present Motion to Dismiss, Plaintiffs are required to plead sufficient facts, read in the light most favorable to the Plaintiff, to raise a claim of entitlement to relief that (1) a statute clearly discriminates against interstate commerce in favor of intrastate, (2) a statute has the practical effect of controlling commerce occurring entirely outside the boundaries of the state of Colorado, and (3) if the statute does not discriminate against interstate commerce, it imposes a burden on interstate commerce which is not commensurate with the local benefits secured.  (See *Twombly*.  See also *Energy Amp*)  Plaintiffs have gone to great lengths to assert the present claim for relief by alleging that Plaintiffs, prior to amendment of Title 5, as amended, entered into contractual relationships with out-of-state rental guests for the beneficial use of Plaintiffs property; as a punitive action, Defendant revoked Plaintiffs' Vacation Home License on Cabin #3 and threatened criminal action if Cabin #3 was rented; the revocation impaired Plaintiffs contractual relationships with out-of-state guests in violation of the dormant Commerce Clause because it prevented performance of the contracts with the out-of-state guests in violation of interstate commerce, which was not contemplated at the time of the offering by Plaintiffs, and was punitive in relation to local benefits; and Title 5, as amended, retroactively upset Plaintiffs' settled contractual expectations concerning revenue and income and investment by out of state residents

(e.g., Complaint, ¶159 through ¶162).  In addition to the specific allegations, Plaintiffs alleged

general allegations throughout the Complaint of the discriminatory nature of Ordinance 02-22

and the burden it places on commerce which is not commensurate for the local benefits secured.

To further detail the above allegations of the Complaint, Plaintiffs note they did have an

existing contract that was in place prior to the enactment date of Ordinance 02-22 on March 22,

2022 for bookings after the effective date on January 1, 2023.  Plaintiffs had a reservation that

was booked on March 3, 2021 for a stay that was to occur July 28 – August 1st, 2022 that was

later moved one year to 2023 when the guest couldn't come in 2022.[6]  Plaintiffs had the

expectation that they would have the chance to contest the ordinance after it became effective in

2023 and request a hearing to argue that it was invalid or, in the alternative, that the exemption

applied to them.  It was not foreseeable that they would not have a chance to argue their case in a

hearing under both theories.  The immediate revocation of their license was a substantial

impairment of their ability to perform under the contract with this guest.

Plaintiffs had also relied on approximately $30,000 in revenue per year from this short-term

rental and the loss of the short-term rental license denied them the ability to make any money

from the property whatsoever.  They were unable to enter into any contractual right, including

with interstate parties, due to the loss of the license.  This action removed Cabin #3 from the

available rental pool, thereby impacting rental availability within the Town.

Plaintiffs also assert that the value of their property was significantly decreased due to Cabin

#3 having its short-term rental vacation home permit revoked as the property was more valuable

---

[6] Plaintiffs present that they properly pled this allegation, but to the extent required, have data from their reservation system and are prepared to confirm the allegation through discovery to substantiate the impact to interstate commerce.

with three cabins having permits than only two.  Additionally, Cabin #3 lost all economic value due to the revocation of its permit because there is no other use for it.  Such acts are likely to impact overall property values, which impact interstate consumers.

In the Complaint, Plaintiffs allege there was no significant and legitimate public purpose supporting the ordinance based on the factors cited in the Town's own study related to an analysis of the contributing factors associated with the affordable housing shortage in the Town. With respect to this claim for relief, the alleged local benefits secured are not in the line with the impact caused on interstate commerce.  In no way did the Root Study lay the problem of a shortage of affordable housing at the feet of short-term rental owners but they were the only class of business or property owners assessed the Impact Fee.  Plaintiffs felt strongly that the ordinance had no significant and legitimate public purpose as there was no "link" between the shortage of affordable housing units and units rented on a short-term basis.  The study clearly showed a wide-variety of reasons why there was a shortage of housing stock, including the fact that the Town had become a retirement and high-income homeowner haven, the large number of second homes, the high price of real estate, the high rental rates of existing units and the lack of development of new units.  All of these factors are likely to impact interstate commerce due to property availability, rental or otherwise.  Even if all 438 short-term rental units were to be taken out of service and put on the market for sale or rent, the sale or rent price would be well-beyond the criteria required to qualify a unit as affordable housing.

Plaintiffs also rebut Defendant's contention that the ordinance doesn't alter a contract between the Plaintiff and the Town.  The very existence of Town Short-Term Residential Application/Building Permit for Short-term Residences (Rented less than 30 days) and short-

term Vacation Home license rental permit creates a contract between the two parties requiring payment of a permit fee, license fee, sales tax, lodging tax and adherence to a wide-variety of municipal regulations and/or requirements directed to short-term rental unit owners.  The immediate revocation of Plaintiffs short-term rental permit caused all of those contracts to be breached, and in at least one known event, impacting interstate commerce.  It is plausible and most likely that multiple interstate contracts were impacted.

Plaintiffs also assert that Ordinance 02-22 was in no way reasonable or comparable to the types of regulations it had been subjected to in the past.  They had no reason to believe based on the prior payment of a license fee and a lodging sales tax that they would then be subjected to another fee in an altogether unrelated subject matter – affordable housing.  There was no foreseeability that this would occur as the Town's own study concluded the shortage of affordable housing units had little to no bearing on them and much more to do with overall market conditions and a lack of new units due to a climate not conducive to development.

Plaintiffs respectfully request their Seventh claim for relief be retained as Defendants have failed to set forth any allegations demonstrating a lack of contracts between the parties.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that Defendant's partial Motion to Dismiss all six of Plaintiff's constitutional claims should be denied.  In the event the Court determines that the Complaint is factually incomplete, Plaintiff respectfully requests leave to amend the Complaint to address Defendant's argued short-comings in the allegations in the original Complaint.

DATED this 15th of August, 2023.


/s/ Jennifer McCallum

Jennifer McCallum
The McCallum Law Firm, P.C.
685 Briggs Street,
Erie, CO 80516
(303) 828-0655
jennifermccallum@mccallumlaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that on 15th of August 2023, I electronically filed the foregoing

**RESPONSE TO PARTIAL MORTION TO DISMISS** using the CM/ECF system which will

send notification of such filing to the following:

Nick Poppe
J. Andrew Nathan
Ashley Hernandez-Schlagel
Attorneys for Defendant
NATHAN DUMM & MEYER P.C.
7900 E. Union Avenue, Suite 600
Denver, CO 80237
(303) 691-3737
ANathan@ndm-law.com
ASchlagel@ndm-law.com
NPoppe@ndm-law.com